# EXHIBIT D

| | DATE FILED: August 23, 2018 2:09 PM |
|---|---|
| Boulder County District Court<br>Boulder County Justice Center<br>1777 6th St.<br>Boulder, Colorado 80302 | |
| GEORGE MONTANO,<br><br>Plaintiff,<br><br>v.<br><br>RICOH USA, INC.,<br><br>Defendant. | COURT USE ONLY |
| David H. Miller, Atty Reg. 8405<br>Adam M. Harrison, Atty Reg. 50553<br>THE SAWAYA & MILLER LAW FIRM<br>1600 Ogden Street<br>Denver, Colorado 80218<br>Telephone: (303) 839-1650<br>Facsimile : (720) 235-4380<br>DMiller@sawayalaw.com<br>AHarrison@sawayalaw.com | Case No:<br><br>Division: |
| COMPLAINT | |

Plaintiff, George Montano, by and through his undersigned counsel from the Sawaya & Miller Law Firm, states and alleges as follows by way of Complaint against Ricoh USA, Inc., the Defendant:

## I. NATURE OF ACTION AND BACKGROUND FACTUAL ALLEGATIONS

1. The Plaintiff, George Montano ("Montano") had worked at Ricoh USA, Inc., ("Ricoh") for many years. While working there as a Senior National Operations Manager ("NOM") in charge of the company's large account with Intuit (an international financial services firm known for its digital TurboTax applications), Ricoh violated Mr. Montano's statutory and common law rights by coercing him, harassing him, threatening him, retaliating against him, and finally by terminating

1

him through constructive discharge because Ricoh's senior level managers did not want him to take his time serving on a jury to which he had been summoned in the high profile murder case of Michael Blagg. Mr. Montano refused to follow the explicit "coaching" of his Global Account Manager ("GAM") on how to lie to get out of performing his civic duty. Rather he told the truth and was picked to serve on the six-week-long murder trial jury which ultimately convicted Mr. Blagg of killing his wife. No one has yet been arrested for the disappearance of the couple's then-six-year-old daughter who disappeared along with Mrs. Blagg, but who was not found with the remains of her mother in the trash dump where her husband was found to have disposed of her body.

2. At the time Mr. Montano was summonsed to report for jury duty in February 2018 he was engaged in business matters concerning a large venture between Ricoh and its client, Intuit. Mr. Montano's direct supervisor, Rob Schwanz, the Director of National Operations Management, and the person who was his day-to-day boss, texted him that if he were chosen for the jury his business responsibilities for the Intuit account would not change; and as he said, "you still own it all."

3. Mr. Montano's GAM, Cathrine Clement, who was in charge of the entire contract on the Intuit account, talked to Mr. Montano by telephone after he received his jury summons and explicitly told him that he needed to get out of serving on the jury and that he could do that simply by testifying that he had a problem with law enforcement and by saying words to the effect of "I don't like cops." Such a statement, if made by Mr. Montano would have been untruthful and perjury.

4. Thereafter, in multiple texts referencing her prior statements about lying to the Court to get out of jury duty Ms. Clement reminded Mr. Montano to, "Just remember my coaching!" (i.e., to falsely testify that he did not like law enforcement), and then additionally texted him saying "Please tell me your [sic] not on the jury!" and, "Please don't get picked!!!!" (Emphasis as in her original texts).

5. Mr. Montano, however, refused to lie to the Court and was selected to serve on the jury.

6. The evidence was gruesome and the trial was emotionally exhausting. However, consistent with the direction from his boss he did his best to "own it all" with respect to the Intuit account. So during the trial—before it began in the morning; during trial breaks during the day, and after trial was done for the day, in the evening—he also did his work on the Intuit network using an Intuit laptop for access.

7. After the long trial the jury entered three days of intense deliberations and convicted Mr. Blagg of the murder of his wife. The murder trial was a case that has drawn national attention.

8. Before being selected for the jury Mr. Montano had been brought in to take over the Intuit account because there had been serious problems with the previous NOM handling the matter.

9. Mr. Montano was regarded by Ricoh as having a history of fixing troubled accounts. Accordingly, Mr. Montano agreed to leave a prior account position and to take on the NOM position as a lateral transfer in charge of operations under the Intuit account.

10. Before he was called to jury duty he had already been successful with the Intuit account in turning it around. For example, Mr. Montano was able to transform a contentious relationship with Intuit into one of partnership and open communication. And Mr. Montano was also able to achieve all contracted service level agreements, deliverables and obligations. When Mr. Schwanz and Mr. Montano sat down to talk about the account before he was subpoenaed to appear for the jury, Mr. Montano stated to Mr. Schwanz that what the account needed was additional support in the nature of an analyst. Mr. Schwanz agreed and a presentation was drawn up to convince Intuit of the need for such support.

11. Then during the jury selection process, and before he was selected, Ms. Clement texted Mr. Montano about how well the account he had taken over was going. She described to him that a meeting with Intuit had gone so well that the Intuit manager had "said great things about Ricoh being a good partner and how happy [the Intuit boss] is!!!" (Emphasis as in original). Mr. Montano had been key to resolving all issues documented on the Intuit Correct Action Plan.

12. After the trial, however, when Mr. Montano returned to Ricoh, he was looked down upon by Mr. Schwanz and Ms. Clement, and treated like he had been on a month-and-a-half long vacation. Aside from the Intuit account, Ricoh had put all his further duties, which involved the responsibility for other global accounts, essentially on hold, so that when he came back he was barraged with an enormous amount of backed-up work for which no accommodation had been made.

13. Shortly after his return—within a less than a month—Mr. Montano was presented with two written "verbal warnings."

14. The first was falsely dated, inaccurately "documenting" a discussion purported to have been on March 30, 2018—a time when Mr. Montano did not have any conversation with Mr. Schwanz because he was in the middle of serving on the jury.

15. Mr. Schwanz's write-up specifically stated that he was going to have to have continuing/weekly talks about Mr. Montano's "initiative" on the Intuit account because of "your six weeks of jury duty." No mention was ever made of what Mr. Schwanz and Mr. Montano had agreed earlier was the real issue—that the account needed the support of an analyst to get Mr. Montano the support that agreed to by Mr. Schwanz. Instead, Mr. Schwanz through his discipline recast the issue as one of Mr. Montano's supposedly lacking "initiative."

16. This was a sham by Mr. Schwanz aimed at punishing Mr. Montano for refusing to lie to the Court to get out of jury duty.

17. The second "verbal warning" in writing was given on the same day, on or about May 3, 2018 (although both documents were not dated by Mr. Schwanz in violation of Ricoh's procedures). That one stated that Mr. Montano was subject to "[f]urther disciplinary action" for not being present when one of the employees he managed was told that he was going to be laid off several weeks down the road by the local manager who was in California with the employee at the time. Under the circumstances Mr. Montano handled the notice in accordance with previously-approved Ricoh policy and in the standard way any such lay-off would or should have occurred. In the (again undated) documentation Ricoh made it clear that the written "verbal warnings" were indeed discipline by saying that if Mr. Montano's actions did not improve he would be subject to: "*Further* disciplinary action." (Emphasis added).

18. Because of Ricoh's post-trial treatment of him Mr. Montano suffered severe stress and anxiety and was forced to go out on medical leave to obtain medical treatment.

19. While he was out on that medical leave under the Family Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA") his boss called him and told him that all of his job duties had been taken from him and that his job had been split up between several Ricoh employees. No mention of any replacement job duties for him was made.

20. While Ricoh actually terminated Mr. Montano when it removed him from all of his job duties as alleged above, his managers' coaching that pressured Mr. Montano to lie to get out of jury duty; the stated refusal to consider reasonably accommodating Mr. Montano's work duties because of his jury service; the subsequent papering of his file with unjustified multiple disciplines; the disdain with which Mr. Montano was treated for having fulfilled his civic duty to serve on the jury in an emotional and high profile murder trial; and finally the removal of all of his job duties, were so intolerable that a reasonable person in Mr. Montano's position would not have been able to continue working at Ricoh, and as such Mr. Montano was constructively discharged.

21. Furthermore, those actions described above violated Mr. Montano's statutory and common law rights; all as described in the claims set forth below.

## II. JURISDICTION AND VENUE

22. This Court has original jurisdiction over Plaintiff's claims because they arise under the laws of the state of Colorado and federal law as alleged herein, and both Mr. Montano and Ricoh are residents of the state of Colorado subject to its regulatory, statutory and common law.

23. Venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims was the result of actions taken by Ricoh management employees operating out of its corporate office within Boulder County, Colorado.

4

## III. PARTIES

24. Plaintiff George Montano ("Montano") is a citizen of the United States of America who resides in unincorporated Jefferson County, Colorado.

25. The address of Plaintiff's counsel and the address of Mr. Montano for notice purposes in this lawsuit is through his counsel at 1600 Ogden Street, Denver, Colorado 80218.

26. Defendant Ricoh is a Delaware for-profit corporation with a Colorado corporate business address of 6300 Diagonal Hwy, Boulder, Colorado 80301.

## IV. FURTHER FACTUAL ALLEGATIONS

27. Ricoh is a more than 50 year old information services company that is the US-based subsidiary of an international company that has been in existence for over 75 years.

28. Ricoh employs over 50 workers, in 20 or more work weeks, within 75 miles of 6300 Diagonal Hwy, Boulder, Colorado 80301.

29. Ricoh is a covered employer under the FMLA with respect to Mr. Montano.

30. Mr. Montano worked for Ricoh for more than the last 12 months preceding his leave and had over 1250 hours of service during that time period.

31. Mr. Montano is a covered employee with respect to Ricoh under FMLA.

32. Mr. Montano has worked out of the Boulder-area office, mostly remotely for over 8 years. Before his last assignment he was a Global Service Delivery Manager ("GSDM") on a major account. For his last assignment he took the title of National Operations Manager ("NOM")—technically a lower hierarchical position—but he had been asked to come over to manage a troubled account with Intuit, Inc., a business and financial software company that already had a NOM. The changing job was a lateral transfer with no reduction in compensation or benefits and so he agreed to take the NOM position.

33. Before being called to serve on the jury, Mr. Montano was successful in his work at Ricoh and on the Intuit account. And he was never before subject to any kind of discipline.

34. From when he was ordered to report in for jury services until after his return to work and then going out on medical leave because of the actions of Ms. Clement and Mr. Schwanz, Mr. Montano experienced the coercion, harassment, threats, and constructive discharge by Ms. Clement and Mr. Schwanz, described within this Complaint.

5

35. Concerning the written verbal warnings given to Mr. Montano within a month of his return, the first one starts out by stating that "Intuit has provided feedback that must be addressed. On February 13, Elicia Young raised concerns about ownership by you." This is the same Elicia Young referenced in a text from Ms. Clement dated February 22nd where the Intuit managers were present at a meeting and where Intuit expressed "great things about Ricoh being a good partner and how happy [Ms. Young's boss] ... is!!!" (Emphasis as in the original).

36. Mr. Schwanz in that verbal warning states that the same manager complained about Mr. Montano, criticizing how it could take him (Mr. Montano) a while to get to his email. Ricoh made that claim when Ms. Clement exclaimed about how happy Intuit was that Ricoh was being such a good business partner.

37. In that verbal warning Mr. Schwanz made it clear that the document was to be looked on as discipline when he explicitly stated that if Mr. Montano's supposed behavior continued a consequence might be "*Further disciplinary action.*" (Emphasis added).

38. Mr. Schwanz also specifically referenced the follow-up deadlines to relate to Mr. Montano's jury service by tying the discipline follow-up action to his time as a juror by saying, "Given your six weeks of jury duty, we will continue weekly calls through June 30."

39. There was no other reason to tie the discipline to that time frame other than to emphasize the fact that Mr. Montano had failed to follow the illegal coaching and pressure of his supervisors to lie to have gotten out of jury service and that the discipline was Ricoh's pay-back for the "trouble" Mr. Montano had caused Ricoh by being honest and doing his difficult civic duty.

40. The second verbal warning that Mr. Montano was given on or around May 3, 2018 accurately bears a date of discussion at the top section of that same date. It too is undated at the signature line of Mr. Schwanz and it too makes it clear that Mr. Schwanz considered the "Verbal Warning Documentation" letter to be actual discipline where he again stated that the consequence of Mr. Montano not improving his behavior would be "*Further disciplinary action.*" (Emphasis added).

41. The matter described in that second warning related to how one of Mr. Montano's second level down reports was informed about an upcoming lay-off. At this time the structure of how such a situation was to be handled was in transition and it was not clear how the situation should have been handled; whether directly through the local Enterprise Site Manager ("ESM") or rather along with the personal participation of Mr. Montano.

42. At the time Mr. Montano had been informed about the upcoming lay-off of the California employee. He called the ESM who was still on the job to talk with her about how the situation could best be handled for all concerned—the Intuit customer, Ricoh and the employee. While he was in communication with the ESM about how most delicately and considerately to give notice to the employee so the employee would have the most time possible to try to get placed into another position within the company before the lay-off, his phone call with the ESM was dropped and the

6

ESM then had lunch with the employee and told him about the upcoming lay-off. Due to the call being dropped, the ESM went forward with the conversation with the employee directly.

43. Before the transition was effective that was a perfectly acceptable method of trying to find the best and most practicable way to give effective notice to the employee to safeguard that employee's job opportunities. Instead of looking at the event as a way to take into account Ricoh's expressed concerns of handling the matter delicately and retaining good will for Ricoh and with Intuit, Mr. Schwanz used the unusual situation to discipline Mr. Montano for handling the matter in a way that would not have been as delicate or considerate or met the needs of the situation. Regardless of whether the action was or was not a technical violation it was not a matter that Ricoh would in the normal course of business have issued employee discipline.

44. After receiving these disciplinary actions which were unjustified it became clear to Mr. Montano that he was being falsely targeted and that his job was in serious jeopardy because he had refused to lie and get out of jury duty. As a result he became overwhelmed with anxiety and stress and had to go out on medical leave of absence for treatment by a doctor and therapist.

45. Mr. Montano properly arranged for such leave under the effective policies at Ricoh and under FMLA, and he was approved for such leave.

46. While Mr. Montano was out on medical leave he received a telephone call from Mr. Schwanz telling him that he had been removed from all account duties with respect to Intuit. In other words, Mr. Montano was told that he no longer had a job description at Ricoh. He was not told what if any job duties he would be given in the future or whether he would have any duties.

47. Ricoh's behaviors described above would have lead any reasonable person in Mr. Montano's position to understand that they had been constructively discharged from Ricoh.

48. At the end of July 2018 Mr. Montano, through undersigned counsel, wrote a letter to Ricoh's General Counsel notifying the company of the above facts, requesting that all information and data in the possession of Ricoh and Intuit reflecting matters associated with Mr. Montano be subject to a Litigation Hold and requesting communication so the parties might talk about the situation cooperatively.

49. In response to that communication Ricoh sent an unsigned letter from the "Ricoh Employment Law Department" saying that the matter would be investigated and directing any future correspondence about the matter be mailed or emailed to the attention of Kimberley Corbin. The unsigned letter stated that if Ricoh had any questions or further response *it would contact undersigned counsel.*

50. On information and belief, Ms. Corbin is a paralegal not licensed to practice law.

51. By subsequent communication through counsel Mr. Montano agreed to be cooperatively interviewed by Ricoh. To date Ricoh has not tried to schedule any such joint interview with Mr. Montano.

52. By Ricoh's management employees pressuring and coaching Mr. Montano to be untruthful with the Jefferson County District Court to avoid jury duty; by failing to accommodate Mr. Montano during his jury service; by improperly papering his personnel file with multiple unjustified discipline; and removing him from all of his job duties without giving him any indication that he would return to his prior or equivalent position while he is on medical leave, along with the scorn and derision leveled at Mr. Montano by his supervisors, Ricoh has constructively and unlawfully discharged Mr. Montano from his employment, coerced, harassed, threatened and retaliated unlawfully against him under FMLA and Colorado state law.

## COUNT I:
## VIOLATION OF C.R.S. § 13-71-134

53. Plaintiff incorporates the facts alleged in each of the foregoing paragraphs as if fully set forth below.

54. At all times relevant to this Complaint, Ricoh was an "employer," as set out in Colorado Revised Statutes § 13-71-134.

55. At all times relevant to this Complaint, Mr. Montano was a Ricoh "employee" as set out in C.R.S. § 13-71-134.

56. Through its actions, as alleged above, Ricoh harassed, threatened and coerced Mr. Montano because of his receipt, response, and performance of his obligations as a potential and actual juror in the criminal murder trial of Michael Blagg in the winter and spring of 2018.

57. Mr. Montano was pressured by Ricoh to lie to and to manipulate the Colorado District Court in the Michael Blagg murder trial in order to avoid serving on the jury. Ricoh instructed Mr. Montano to take that action so it could maximize its own corporate profits to the detriment of the integrity of the Colorado criminal justice system.

58. Ricoh acted willfully in its violation of C.R.S. § 13-71-134 by repeatedly and explicitly making its improper demands of Mr. Montano and by not reasonably accommodating his jury service, as well as through the other actions described herein.

## COUNT II:
## VIOLATION OF WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

59. Plaintiff incorporates the facts alleged in each of the foregoing paragraphs as if fully set forth below.

60. As the Chief Justice of the Colorado Supreme Court has instructed Colorado employers like Ricoh:

> Colorado citizens serve a jurors in courtrooms across the state to ensure the integrity of our justice system. Recognizing the importance of jury service, the state legislature has enacted statues governing the rights and obligations of both employers and employees when an employee has jury duty. . . . In addition, employers cannot threaten, coerce, or discharge an employee for reporting for jury duty as summoned.

See Letter by the Colorado Chief Justice published on-line at:
https://www.courts.state.co.us/Jury/Employer.cfm

61. Through the rules of the justice system as summarized above by Chief Justice Rice, as well as the statutory mandates and policies set out in controlling law (including the provisions of Article 71 of Title 13 of the Colorado Revised Statutes), Colorado has set out its public policy of protecting the rights of its citizens to be free from employer coercion, harassment, threats, and penalties for their participation in the Colorado jury system.

62. Ricoh interfered with such public policy and Mr. Montano's rights through its actions described above, thus undermining the clearly expressed public policies enunciated in Colorado's statutory and common law mandates.

63. Mr. Montano was participating in the Colorado jury system when he was coerced, harassed, threatened and then discharged and constructively discharged from his employment at Ricoh. Ricoh engaged in the actions described above, including but not limited to improperly disciplining Mr. Montano, failing reasonably to accommodate his work schedule, and most tellingly, removing him from all of his work duties during his medical leave; all because he refused to lie to and manipulate the Colorado District Court to avoid jury duty so Ricoh could make more corporate profits and not have its business affected.

64. Ricoh acted willfully, with reckless disregard for the rights of Mr. Montano and Colorado law, as described above, and Mr. Montano suffered damages as described above because of such willful and reckless conduct.

## COUNT III:
### BREACH OF CONTRACT

65. Plaintiff incorporates the facts alleged in each of the foregoing paragraphs as if fully set forth below.

66. Ricoh, through its explicit adoption of a policy directly on point (HRP36) agreed with Mr. Montano that he would not be subject to coercion, harassment, threats, and / or penalties for his participation in the Colorado jury system.

9

67. Consideration was and has been offered and accepted between the parties for such agreement.

68. Through its actions described above Ricoh has violated the terms of that agreement, all to the damage of Mr. Montano.

## COUNT IV:
### WILLFUL AND WANTON BREACH OF CONTRACT

69. Plaintiff incorporates the facts alleged in each of the foregoing paragraphs as if fully set forth below.

70. Ricoh's actions as described above in coercing, threatening, harassing and punishing Mr. Montano for having truthfully and honestly participated in the Colorado jury system were willful and wanton because its conduct was purposeful conduct committed recklessly that exhibits an intent consciously to behave, beyond mere unreasonableness.

71. Because Ricoh's actions were willful and wanton Mr. Montano is entitled to the additional damages requested below for the damages he suffered as a result of Ricoh's conduct.

## COUNT V:
### PROMISSORY ESTOPPEL

72. Plaintiff incorporates the facts alleged in each of the foregoing paragraphs as if fully set forth below.

73. Ricoh promised and agreed that as a policy and condition of employment it would not coerce, harass, threaten or punish Mr. Montano for truthfully participating in the Colorado jury system. See Ricoh policy HRP36.

74. Ricoh's actions, as described above, violated that undertaking.

75. Ricoh knew, or should have known, that Mr. Montano would rely on its promise by truthfully and in good faith participated in the Colorado jury system in reliance on Ricoh's expressed Human Resource Policy.

76. In reliance on that promise, Mr. Montano truthfully and in good faith participated in the Colorado jury system and served for approximately six weeks on the murder case of the State of Colorado v. Michael Blagg.

77. Mr. Montano was harmed by Ricoh through its coercion, harassment, threats and punishment based on his reasonable reliance on Ricoh's representations that he would not be so

harmed when it engaged in the actions involving such coercion, harassment, threats and punishment described above.

78. Ricoh's policy and promises must be enforced to address the injustice Mr. Montano has experienced, and to prevent further injustice.

## COUNT VI:
### UNLAWFUL RETALIATION UNDER FMLA

79. Plaintiff incorporates the facts alleged in each of the foregoing paragraphs as if fully set forth below.

80. By taking approved FMLA leave Mr. Montano engaged in activity protected under the provisions of FMLA.

81. As alleged above Mr. Montano was subject to improper coercion, harassment, retaliation and constructive discharge. In sum, he was the subject of improper discipline by derisive management which was angered by his refusal to lie to avoid jury service in the Jefferson County District Court murder trial, followed by his removal from all his work duties while on leave, without the offer of the same or equivalent employment following his return from to service.

## COUNT VII:
### UNLAWFUL PROHIBITION OF LEGAL ACTIVITIES AS A CONDITION OF EMPLOYMENT

82. Plaintiff incorporates the facts alleged in each of the foregoing paragraphs as if fully set forth below.

83. Ricoh constructively discharged Mr. Montano when it removed all of his job duties while he was out on approved leave.

84. Among the other reasons stated here Ricoh also constructively discharged Mr. Montano due to his serving on the jury in the Michael Blagg murder trial which was a lawful activity that occurred off the premises of Ricoh during nonworking hours.

85. Pursuant to C.R.S. § 24-24-402.5 that constructive discharge was an unfair employment practice which resulted in Mr. Montano suffering damages.

## V. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Mr. Montano, respectfully asks the Court to find in his favor and order and award to him:

11

A. An Order declaring that Ricoh's practices alleged herein violate the Colorado Juror Protection Laws and public policy; were an unfair employment practice under the Colorado Unlawful Prohibition of Legal Activities Law; violated the contract and / or promises and policies made and / or enforced between Ricoh and Mr. Montano; violated FMLA's anti-retaliation provisions, as well as the Colorado common law;
B. Provide Mr. Montano actual and compensatory damages and provide additional damages for his pain and suffering;
C. Provide an Order allowing Mr. Montano to seek punitive damages based on Ricoh's willful and wanton behavior pursuant to C.R.S. § 13-21-102;
D. Provide back and front pay for Mr. Montano, to the extent compensable;
E. Provide statutory penalties and treble damages as well as Mr. Montano's reasonable attorney's fees and costs under C.R.S. § 13-71-134 and § 24-34-402.5 (2)(b);
F. Provide reasonable attorney's fees and costs under all other such authority; and
G. Provide all other and further relief as the Court may find to be equitable and just.

Dated this 23rd day of August, 2018.

Respectfully submitted,

*/s/ David H. Miller*

David H. Miller
Adam M. Harrison
SAWAYA & MILLER
1600 Ogden Street
Denver, Colorado 80218
Telephone: 303.839.1650
E-mail: dhmiller@sawayalaw.com
        aharrison@sawayalaw.com

*Counsel for the Plaintiff George Montano*